**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| IN RE APPLICATION OF OVIK MKRTCHYAN FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:25-mc-00041 |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S**
***EX PARTE* APPLICATION FOR AN ORDER TO TAKE DISCOVERY**
**FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ............................................................................. 1

II.  FACTUAL BACKGROUND .............................................................................. 3

A.   The Parties and Relevant Third Parties ...................................................... 3

B.   In 2024, Akard Joined a Coordinated Campaign to Destroy Mkrtchyan's Reputation and Harm His Interests .............................................................. 6

  1. Shadmanov's Attempts to Force Mkrtchyan to Engage in Illegal Acts (2023).. 6

  2. Mkrtchyan's Unlawful Detention in Uzbekistan (January-April 2024) ............ 7

  3. The Campaign to Disparage Mkrtchyan and Harm His Reputation (mid-2024 through now) ...................................................................................... 8

  4. Respondents' Participation in the Campaign (mid-2024) ................................ 8

C.   Mkrtchyan Has Brought Claims for Civil Libel Against Two Defendants in England, and He Is Contemplating Additional Claims .............................. 9

D.   Respondents Possess Information That Is Material to the Pending and Contemplated Proceedings in England ...................................................... 11

III. ARGUMENT .................................................................................................... 12

A.   Legal Framework ........................................................................................ 12

B.   The Application Satisfies the Statutory Requirements of 28 U.S.C. § 1782 ........ 13

  1. Respondents Are "Found" in the Southern District of Indiana ........................ 14

  2. The Application Seeks "Evidence" in the Form of Non-Privileged "Documents" Held by Respondents ........................................................ 15

  3. The Discovery Sought Is for Use in Pending or Contemplated Proceedings in a Foreign Tribunal ....................................................................................... 16

  4. Mkrtchyan Is an Interested Person ................................................................ 18

C.   The *Intel* Discretionary Factors Favor Authorizing the Requested Discovery ..... 19

  1. The First Factor Favors Granting the Application ........................................... 19

  2. The Second Factor Favors Granting the Application ...................................... 19

  3. The Third Factor Favors Granting the Application .......................................... 20

  4. The Fourth Factor Favors Granting the Application ........................................ 21

IV.  CONCLUSION ................................................................................................ 22

## **TABLE OF AUTHORITIES**

**Cases:**                                                                                           **Page(s):**

*Direitos Creditórios Nao Padronizados v. Gen. Motors Co.*,
    110 F.4th 586 (3d Cir. 2024) ........................................................................17

*Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*,
    27 F.4th 136 (2d Cir. 2024) .........................................................................13

*Frasers Grp. PLC v. Gorman*,
    2023 WL 6938284 (S.D.N.Y. Oct. 19, 2023) ...........................................20

*Glock v. Glock, Inc.*,
    797 F.3d 1002 (11th Cir. 2015) ..................................................................12

*Heraeus Kulzer, GmbH v. Biomet, Inc.*,
    633 F.3d 591 (7th Cir. 2011) ................................................................12, 21

*In re Banco Mercantil del Norte, S.A.*,
    126 F.4th 926 (4th Cir. 2025) ....................................................................12

*In re Bayer Healthcare LLC*,
    2014 WL 2801206 (N.D. Ill. June 19, 2014) ........................................ 12-13

*In re BM Brazil 1 Fundo de Investimento,* 2024 WL 555780, at *11 (S.D.N.Y.
    Jan. 18, 2024), *report and recommendation adopted sub nom.*, 2024 WL
    554302 (S.D.N.Y. Feb. 12, 2024) ........................................................ 19-20

*In re BonSens.org*,
    95 F.4th 75 (2d Cir. 2024) ..........................................................................17

*In re Consorcio Ecuatoriano de Telecomunicaciones S.A..*,
    747 F.3d 1262 (11th Cir. 2014) ..................................................................17

*In re Degens*,
    2020 WL 4252725 (S.D.N.Y. July 24, 2020) ...........................................15

*In re del Valle Ruiz*,
    939 F.3d 520 (2d. Cir. 2019)......................................................................14

*In re Edelman*,
    295 F.3d 171 (2d Cir. 2002)..................................................................12, 14

*In re Kleimar N.V v. Benxi Iron & Steel Am., Inc.*,
    2017 WL 3386115 (N.D. Ill. Aug. 7, 2017) ..............................................12

*In re Kurbatova*,
    2019 WL 2180704 (S.D. Fla. May 20, 2019) ...........................................14

*In re Kuwait Ports Auth.*,
  2025 WL 1529798 (D.D.C. May 29, 2025) ....................................................................16

*In re Lane*,
  2022 WL 16737132 (S.D.N.Y. Nov. 7, 2022) ........................................................... 15-16

*In re Medytox, Inc.*,
  2019 WL 3162174 (S.D. Ind. July 16, 2019) ................................................... *passim*

*In re On Otomasyon*,
  2011 WL 13150535 (N.D. Ind. Oct. 20, 2011) ..................................................13, 21

*In re Sabag*,
  2021 WL 1634781 (S.D. Ind. Apr. 26, 2021) ............................................... 17-18

*In re Sabag*,
  2022 WL 17687905 (S.D. Ind. Dec. 15, 2022) ...........................................14, 19

*In re Sarrio S.A*,
  173 F.R.D. 190 (S.D. Tex. 1995) ..............................................................................20

*In re SBK ART LLC*,
  2025 WL 1537474 (S.D.N.Y. May 30, 2025) .........................................................15

*In re Semrush SM LLC*,
  2022 WL 3084601 (S.D. Ind. July 6, 2022)............................................ 16-17, 19

*In re Veiga*,
  746 F. Supp. 2d 8 (D.D.C. 2010) ....................................................................... 16-17

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ..................................................................................... *passim*

*LEG Q LLC v. RSR Corp.*,
  2017 WL 3780213 (S.D. Tex. Aug. 31, 2017) ......................................................20

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015).....................................................................................17

*Servotronics, Inc. v. Rolls-Royce PLC*,
  975 F.3d 689 (7th Cir. 2020) ...................................................................................12

*Texas Keystone, Inc. v. Prime Nat. Res., Inc.*,
  694 F.3d 548 (5th Cir. 2012) ..................................................................................21

**<u>Statutes, Rules & Regulations</u>**

28 U.S.C. § 1782 ................................................................................................................. *passim*

Fed. R. Civ. P. 26 ...........................................................................................................................21

Pursuant to 28 U.S.C. § 1782, Petitioner Ovik Mkrtchyan respectfully submits this memorandum of law in support of his *ex parte* application ("Application") for an order authorizing him to obtain discovery from Respondents Stephen Akard, his law and public affairs firm Bose McKinney & Evans LLP, and the firm's subsidiary Bose Public Affairs Group LLC (collectively with the firm, "Bose McKinney") for use in pending and contemplated litigation in England by serving the document subpoenas attached to the Application. Respondents have engaged in certain lobbying, consulting, public relations, and other non-legal activities on behalf of an individual and his company in Uzbekistan who have been waging an unlawful campaign to harm Mkrtchyan. In August 2024, Akard, a partner at an Indiana law and public affairs firm, sent an unsolicited, highly disparaging letter directly to the President of Uzbekistan, Shavkat Mirziyoyev, with whom Akard appears to have no prior relationship, accusing Mkrtchyan of serious misdeeds. The Application seeks discovery related to that letter and the broader coordinated disinformation campaign against Mkrtchyan in which Respondents are participating.

## I.    PRELIMINARY STATEMENT

This Application arises from an ongoing campaign by individuals and entities around the world to injure Mkrtchyan tortiously and by unlawful means, first by engineering his illegal detention in Uzbekistan, and then by disseminating false and disparaging information about him to third parties (the "Campaign"). Some participants in the Campaign are known—for example, Mkrtchyan recently brought civil libel claims in England against the owners of *The London Post* and Radha Stirling, who published defamatory content about him. Others, however, have not yet been identified, or the full scope of their activities is not yet known.

On information and belief, Respondents Akard and Bose McKinney have participated in the Campaign. Declaration of Petitioner ("Pet's Decl.") ¶¶ 9, 31. Akard is an attorney and non-

legal advisor for Ulugbek Shadmanov, a businessman from Uzbekistan, and Shadmanov's company, United Cement Group ("UCG"). *Id.* ¶ 9. On August 16, 2024, Akard, acting on behalf of UCG, sent a highly unusual, unsolicited letter to President Mirziyoyev of Uzbekistan, with a copy to the Uzbek Ambassador to the United States in Washington, D.C. *Id.* ¶ 22. The letter attached a report, purportedly commissioned from a "preeminent," but unidentified, "U.S. corporate investigatory firm, comprised of former U.S. law enforcement and intelligence community experts." *Id.* ¶ 23. Akard "hope[d]" that this report would "prove[] useful to [President Mirziyoyev] and appropriate Uzbek law enforcement officials," and offered to "provide additional background information" to the country's Ambassador in Washington. *Id.* ¶ 28.

The report—a six-page document titled "Report on the Nefarious Activities of Uktam Aripov"—is replete with false and unsubstantiated accusations of serious misconduct by Mkrtchyan, including ties to Russian organized crime, threats, and extortion. *Id.* ¶¶ 25, 27.[1] The report makes numerous false allegations about Aripov, a business associate of Mkrtchyan who resides in Canada. *Id.* ¶ 26. The allegations in the report about Mkrtchyan closely track baseless claims about Mkrtchyan that have appeared in purported articles, blog posts, and other paid content distributed by participants in the Campaign around the world. *Id.* ¶ 34.

This Application satisfies the statutory requirements of Section 1782 and the discretionary factors identified by the Supreme Court in *Intel Corporation v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). With respect to the statutory requirements: (1) Respondents "reside" or are "found" in this district because Respondents Akard and Bose McKinney are based in and subject

---

[1] Due to the highly disparaging nature of Akard's letter and "report," Mkrtchyan did not attach them to this publicly-filed Application, but can move to file them under seal if the Court wishes to review them.

to personal jurisdiction in Indianapolis; (2) Mkrtchyan seeks evidence in the form of documents; (3) the discovery sought by Mkrtchyan is "for use in" pending or reasonably contemplated proceedings before an English court; and (4) Mkrtchyan, as the claimant (plaintiff) in the English proceedings, is an "interested person" here.  In addition, each of the *Intel* discretionary factors favors the requested discovery.  Accordingly, Mkrtchyan respectfully requests that the Court grant his Application and permit him to serve the attached subpoenas on Respondents.

## II.    FACTUAL BACKGROUND

### A.    The Parties and Relevant Third Parties

***Ovik Mkrtchyan (Petitioner).***  Ovik Mkrtchyan is an entrepreneur and innovator who manages multiple businesses in several European countries.  Pet's Decl. ¶¶ 3, 5.  Mkrtchyan was born in Armenia and raised in Uzbekistan, and he now resides in Europe.  *Id.* ¶ 4.  Mkrtchyan's businesses—primarily located in the United Kingdom, Switzerland, Uzbekistan, and Latvia— reflect a focus on innovation, sustainability, and technology.  *Id.* ¶¶ 5-6.  The website for Mkrtchyan's investment company, Gor Investment Limited, describes some of these projects, which include initiatives to combat infection in medical patients, process and dispose of hazardous waste, harness gas metallurgy technology for the production of nano powders of rare and precious metals, and train young engineers in Uzbekistan. *Id.* ¶ 6, Ex. 1.  Gor's advisory board reflects the company's global reach and technological prowess.  Its members have included former U.S. Secretary of State Mike Pompeo, former U.S. Secretary of Energy and Governor of Texas Rick Perry, former director of the Oak Ridge National Laboratory Dr. Thomas Zacharia, and former U.S. Under Secretary of State Thomas A. Shannon, Jr.  *Id.* ¶ 7.

***Stephen Akard (Respondent).***  Akard is a partner at the law and public affairs firm Bose McKinney & Evans in Indianapolis.  Declaration of Ryan Hartman ("Hartman Decl.") ¶ 3, Ex. 1. According to his website profile, Akard is a partner in the firm's "Site Selection and Economic

Incentives Group" who "works with businesses on economic development opportunities in the Midwest and across the United States," with a "special emphasis on economic development contract language and compliance." *Id.* According to Akard, he "represent[s] [Shadmanov's company UCG] with respect to certain legal and related matters impacting their global operations." Pet's Decl. ¶ 22.

**Bose McKinney & Evans LLP (Respondent).** Bose McKinney & Evans is a law and public affairs firm based in Indianapolis. Hartman Decl. ¶ 4, Ex. 2. According to Akard, the firm represents UCG, which is owned by Shadmanov. Pet's Decl. ¶¶ 9, 22.

**Bose Public Affairs Group LLC (Respondent).** Bose McKinney & Evans has a subsidiary, Bose Public Affairs Group, that is "a fully integrated public affairs firm" (Hartman Decl. ¶ 5, Ex. 3) and that "provides clients with local, state and federal government relations, strategic communications, procurement and strategic advisory services." *Id.* ¶ 4, Ex. 2. Bose McKinney & Evans's website lists Bose Public Affairs Group as a "service area" of the firm. *Id.* ¶ 6, Ex. 4. Both the firm and its subsidiary have the same address and suite number in Indianapolis. *Id.* ¶¶ 7-8, Exs. 5-6.

**Ulugbek Shadmanov and United Cement Group (third parties).** Shadmanov is an Uzbek businessman. Pet's Decl. ¶ 9. On information and belief, Shadmanov is the principal shareholder of UCG, which is the largest cement producer in Central Asia. *Id.*

**2Trom Media Group and Viktor Tokarev, owners of The London Post (third parties and defendants in English proceedings).** *The London Post* is an online content hosting platform that, on information and belief, is owned by 2Trom News Group, which is itself primarily owned by Viktor Tokarev of Moscow Media Group. Declaration of Nigel Tait ("Tait Decl.") ¶¶ 9, 17. Notwithstanding that its name suggests that it is a newspaper or news media entity, *The London*

*Post* posts a wide range of content, much of which appears to be the result of paid placements and/or derived directly from press releases or other public relations activities. Mkrtchyan has brought suit against 2Trom News Group and Tokarev for libel in England based on their October 2024 publication of false and disparaging content about him (the "London Post Content"). *Id.* ¶¶ 9, 11, Ex. 1.

**Radha Stirling (third party and defendant in English proceedings).**  Radha Stirling is a public relations consultant based outside the United States. *Id.* ¶ 10. According to her website, a 2018 Daily Beast article described her as running "an extraordinarily slick – and convincing – PR campaign" on behalf of Princess Latifa bint Mohammed Al Maktoum of the Dubai ruling family. Hartman Decl. ¶ 9, Ex. 7. She operates these campaigns through organizations she founded with seemingly benevolent names such as Detained in Dubai, Due Process International, and IPEX (Interpol and Extradition) Reform. *Id.* According to press reporting about Stirling's work, Shadmanov is one of Stirling's clients. *Id.* ¶ 10, Ex. 8. Mkrtchyan has sued Stirling for libel in England based on false and disparaging content about him that she posted online in January 2025 (the "Stirling Content"). Tait Decl. ¶¶ 10, 12-13, Exs. 2-3.

**Other participants in the Campaign.**  Many of the other participants in the Campaign are unknown, and the requested discovery will be critical to uncovering their identities. Others, such as Stephen Payne (Mkrtchyan's former business associate, who also sent a false and disparaging letter about Mkrtchyan to a senior figure in Uzbekistan) and his companies are known, but the full scope of their involvement in the Campaign is not.[2] The relationships between the various actors

---

[2] Mkrtchyan filed a Section 1782 application in another federal court for an order allowing him to seek discovery from Payne and his companies about their participation in the Campaign. The application was granted on June 18, 2025. *See* Hartman Decl. ¶ 11, Ex. 9, Order Granting

and their activities—Respondents, Payne and his companies, *The London Post*, Stirling, Shadmanov, Shadmanov's company UCG, and Shadmanov's other agents—suggest that their efforts are coordinated and motivated by a shared intent to harm Mkrtchyan.

**B.    In 2024, Akard Joined a Coordinated Campaign to Destroy Mkrtchyan's Reputation and Harm His Interests**

Over the last two years, Mkrtchyan has been the victim of an aggressive campaign led by Shadmanov to harm Mkrtchyan and his interests. This Campaign has included:

- unsuccessful attempts by Shadmanov to force Mkrtchyan to engage in illegal conduct (2023);
- a successful effort to orchestrate Mkrtchyan's unlawful detention in Uzbekistan (January-April 2024);
- a false and disparaging letter sent by Payne to Uzbek President Mirziyoyev (August 2024);
- a similar false and disparaging letter sent by Akard and Bose McKinney to Uzbek President Mirziyoyev (August 2024);
- a failed attempt to engineer Mkrtchyan's rearrest in Uzbekistan (August 2024);
- libelous content posted by *The London Post* (October 2024);
- libelous content posted by Stirling (January 2025); and
- numerous other false and disparaging "articles" and posts (July 2024-present).

Pet's Decl. ¶ 10.

**1.    *Shadmanov's Attempts to Force Mkrtchyan to Engage in Illegal Acts (2023)***

Shadmanov's attacks on Mkrtchyan began in 2023. *Id.* ¶ 13. At that time, Shadmanov demanded that Mkrtchyan leverage his connections in the United States to put certain Uzbek citizens on the U.S. sanctions list that would prompt the prosecution of those individuals in

---

Application, No. 4:25-mc-01122, *In re Mkrtchyan*, in the U.S. District Court for the Southern District of Texas.

Uzbekistan.  *Id.*  Mkrtchyan was even provided with personal information of the targeted individuals, including passport and itinerary information.  *Id.*  Shadmanov warned Mkrtchyan that if he failed to satisfy Shadmanov's demands, his business projects in Uzbekistan would be shut down.  *Id.*

Despite these threats, Mkrtchyan refused to comply with Shadmanov's unlawful demands. *Id.* ¶ 14.  As a result, Mkrtchyan became the target and ultimately the victim of unlawful persecution, organized by Shadmanov through people close to him in the Uzbek government.  *Id.*

### 2. *Mkrtchyan's Unlawful Detention in Uzbekistan (January-April 2024)*

In early 2024, Mkrtchyan's adversaries succeeded in orchestrating Mkrtchyan's wrongful detention in Uzbekistan.  *Id.* ¶ 15.  On information and belief, Shadmanov and his agents were responsible for this unlawful detention.  *Id.*  Mkrtchyan was held under harsh conditions for several months.  *Id.* ¶ 16.  Officials confined him to a small cell, repeatedly interrogated him, denied him access to medication and other necessities, and attempted unsuccessfully to extract money and false confessions from him.  *Id.*

While Mkrtchyan was detained, Mkrtchyan's former business associate Payne sent a letter of support to the President of Uzbekistan calling for Mkrtchyan's release, explaining that Mkrtchyan had been unfairly targeted by Shadmanov and UCG.  *Id.* ¶¶ 17-18, Ex. 2.  Payne's letter, dated April 10, 2024, included the following statements:

- "On January 17, 2024 upon their departure from the office in Tashkent, Mr. Ovik Mkrtchyan and his daughter were detained by officers of the SGB (State Security Service)."

- "For the duration of his detainment from 17 January 2024 the officers of SGB were constantly pressing Mr. Ovik Mkrtchyan to admit guilt for crimes he did not commit."

- "Since Mr. Mkrtchyan did not admit any fictitious charges, the SGB personnel resorted to pressuring and forcing the relatives and acquaintances of Mr. Mkrtchyan to provide fictitious information that would incriminate him."

7

- "The true reason behind this issue is a conflict between Mr. Ovik Mkrtchyan on one hand, and" a group headed by "Shadmanov . . . on the other."

*Id.* ¶ 18, Ex. 2.

Throughout his detention, Mkrtchyan refused to confess to crimes he had not committed. *Id.* ¶ 19. He ultimately was released in April 2024. *Id.* Official records confirm that he was not convicted of any crimes. *Id.* ¶ 20.

### 3.    The Campaign to Disparage Mkrtchyan and Harm His Reputation (mid-2024 through now)

After his release, Mkrtchyan's adversaries turned their efforts to damaging his reputation with Uzbek officials and laying the groundwork for his rearrest. *Id.* ¶ 35. Beginning around July 2024, numerous disparaging articles about Mkrtchyan began appearing online. *Id.* ¶¶ 10, 34. Some of that disparaging content is the subject of ongoing libel proceedings in the English courts, as described below. *Id.* ¶¶ 37-40.

### 4.    Respondents' Participation in the Campaign (mid-2024)

On August 16, 2024, Akard, acting on behalf of Shadmanov's company UCG, sent a highly unusual letter to President Mirziyoyev of Uzbekistan, with a copy to the Uzbek Ambassador in Washington, D.C. *Id.* ¶ 22. The letter, on Bose McKinney letterhead, claimed that UCG had "engaged a preeminent U.S. corporate investigatory firm, comprised of former U.S. law enforcement and intelligence community experts," to document certain "unfounded allegations" about UCG and Shadmanov. *Id.* ¶ 23. Akard's letter did not identify the investigatory firm, but attached an unsigned, undated "report" that this "firm" had ostensibly prepared. *Id.* ¶ 24.

The purported investigatory report, titled "Report on the Nefarious Activities of Uktam Aripov," is a six-page document, accompanied by an assortment of exhibits. *Id.* ¶ 25. The report makes numerous false allegations about Aripov, a business partner of Mkrtchyan. *Id.* ¶ 26. It also contains numerous false allegations about Mkrtchyan and his business, including that Mkrtchyan

allegedly has ties to Russian organized crime and has engaged in extortion and "corrupt activities." *Id.* ¶ 27.

Akard "hope[d]" that the report "proves useful to [President Mirziyoyev] and appropriate Uzbek law enforcement officials," and offered "to provide additional background information to [the Uzbek] Ambassador in Washington, D.C." *Id.* ¶ 28. Akard signed the letter with his title "U.S. Ambassador (ret.)." *Id.* ¶ 29. On information and belief, Akard and Bose McKinney have also sent communications containing false and disparaging information about Mkrtchyan to other individuals. *Id.* ¶ 30.

The timing and content of Akard's August 16 letter to President Mirziyoyev coincided with a similar letter sent by Mkrtchyan's former business associate Payne to President Mirziyoyev. *Id.* ¶¶ 32-33. Payne (who had written to President Mirziyoyev just four months before, urging him to release Mkrtchyan from detention) expressly retracted his prior statements in Mkrtchyan's support. *Id.* ¶ 33. Instead, Payne now alleged that Mkrtchyan had ties to Russian organized crime and had engaged in threats and extortion. *Id.*

Around the same time in mid-2024, Mkrtchyan learned of a renewed plot to orchestrate his arrest. *Id.* ¶ 35. Fortunately, he and his family were able to leave the country before he was rearrested, and they have resided outside of Uzbekistan since then. *Id.* ¶ 36.

### C.    Mkrtchyan Has Brought Claims for Civil Libel Against Two Defendants in England, and He Is Contemplating Additional Claims

Mkrtchyan seeks to redress the harms caused by the Campaign in both pending and contemplated proceedings in England and Wales. He has filed civil libel claims against two participants—the owners of *The London Post* and Stirling—and anticipates pursuing additional claims, including claims for libel and conspiracy to injure, against defendants subject to jurisdiction in England and Wales. Tait Decl. ¶ 18; Pet's Decl. ¶ 37.

***Libel proceedings against the owners of The London Post.*** Mkrtchyan's English counsel filed a libel claim against the owners of *The London Post*—2Trom Media Group and Viktor Tokarev of Moscow Media Group—on April 22, 2025. Tait Decl. ¶¶ 1, 9, 11, Ex. 1. 2Trom Media Group is primarily owned by Tokarev. The claim seeks damages (including aggravated damages arising from the fact that the content was published as part of or pursuant to the Campaign), injunctive relief, and other statutory remedies for libel arising from the publication of the London Post Content. *Id.* ¶¶ 9, 11, Ex. 1. Particulars of Claim were served on June 12, 2025. *Id.* ¶ 13, Ex. 4.

***Libel proceedings against Stirling.*** Mkrtchyan's English counsel filed a libel claim against Stirling on April 22, 2025. *Id.* ¶¶ 1, 10, 12, Ex. 2. The claim seeks damages (including aggravated damages) arising from the publications for which Stirling is responsible that were posted as part of the Campaign, injunctive relief, and other statutory remedies for libel arising from the publication of the Stirling Content. *Id.* ¶¶ 10, 12, Ex. 2. Particulars of Claim were served on June 6, 2025. *Id.* ¶ 13, Ex. 3.

***Pending and contemplated proceedings.*** Based on evidence gathered to date, Mkrtchyan believes that *The London Post* and Stirling did not act independently and in isolation; rather, they were part of the larger Campaign to harm him and his interests tortiously and by unlawful means. Pet's Decl. ¶ 38. As explained above, the Campaign's activities to date have included an unsuccessful effort to pressure Mkrtchyan to engage in unlawful acts; a successful effort to unlawfully detain Mkrtchyan in Uzbekistan; a false and disparaging letter sent by Respondent Akard to President Mirziyoyev; a false and disparaging letter sent by Payne to President Mirziyoyev; a failed attempt to engineer Mkrtchyan's rearrest in Uzbekistan; libelous content posted by *The London Post* and Stirling; and dozens of other false and disparaging articles and

posts published online. *Id.* ¶ 10.  To redress these harms, Mkrtchyan is pursuing his existing libel claims against the owners of *The London Post* and Stirling, and filed the above-referenced Particulars of Claim asserting that *The London Post* and Stirling published their content as part of a broader, coordinated disinformation campaign carried out against him.  Tait Decl. ¶¶ 8-14, 16-18; Pet's Decl. ¶¶ 37-40.

In addition, Mkrtchyan intends to bring additional claims in the courts of England and Wales, including an anticipated claim for conspiracy to injure him.  Tait Decl. ¶¶ 14, 18; Pet's Decl. ¶¶ 38-41.  Both his existing and contemplated claims will be based in part on any supporting evidence of a broader coordinated disinformation campaign and/or conspiracy that is gathered as part of this Application.  Tait Decl. ¶ 20; Pet's Decl. ¶ 40.

### D.    Respondents Possess Information That Is Material to the Pending and Contemplated Proceedings in England

The existing evidence suggests that Respondents and their clients Shadmanov and UCG are participants in the Campaign and that Respondents accordingly possess material information about the Campaign's activities.  The allegations in Akard's letter to Uzbek officials (and the attached report) closely track allegations made by others who have sought to harm Mkrtchyan.  In particular, similar allegations appear in the August 2024 letter from Payne, the October 2024 article published by *The London Post*, Stirling's January 2025 content, and other online content published by hosting platforms around the world.  Pet's Decl. ¶¶ 32-34.  These similarities suggest that these actors are acting in concert to damage Mkrtchyan's reputation.  The timing likewise suggests a coordinated campaign:  Akard and Payne both sent unsolicited letters to President Mirziyoyev in August 2024, and disparaging articles about Mkrtchyan were published online around this time as well.  *Id.* ¶ 32.

As described in the proposed subpoenas, if Mkrtchyan's Application is granted, Mkrtchyan will seek non-privileged documents from Respondents about their interactions with *The London Post*, Stirling, and other participants in the Campaign, as well as their other actions taken in furtherance of the Campaign. This information is highly relevant to both the pending and contemplated proceedings in England and Wales.

## III.    ARGUMENT

### A.    Legal Framework

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel*, 542 U.S. at 247. Under 28 U.S.C. § 1782, titled "Assistance to foreign and international tribunals and to litigants before such tribunals," a district court may authorize discovery "for use in a proceeding in a foreign or international tribunal." Section 1782's purpose is "to permit a party to litigation in a foreign country to seek discovery relating to that litigation in a federal district court, and, in the discretion of that court, to obtain as much discovery as it could if the lawsuit had been brought in that court rather than abroad." *In re Kleimar N.V v. Benxi Iron & Steel Am., Inc.*, No. 17-cv-01287, 2017 WL 3386115, at *3 (N.D. Ill. Aug. 7, 2017) (quoting *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 594 (7th Cir. 2011)). Congress has granted district courts "broad discretion" to grant an application under Section 1782. *In re Banco Mercantil del Norte, S.A.*, 126 F.4th 926, 931 (4th Cir. 2025); *Glock v. Glock, Inc.*, 797 F.3d 1002, 1005 (11th Cir. 2015); *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002). Courts routinely grant Section 1782 applications *ex parte*, without prejudice to the subpoena recipient subsequently moving to quash or modify the subpoenas or seek to limit the scope of the discovery sought under the Federal Rules of Civil Procedure. *See, e.g.*, *Servotronics, Inc. v. Rolls-Royce PLC*, 975 F.3d 689, 691-92 (7th Cir. 2020); *In re Bayer*

12

*Healthcare LLC*, No. 14 C 3918, 2014 WL 2801206, at *2 (N.D. Ill. June 19, 2014); *In re On Otomasyon*, No. 2:11-MC-157-PRC, 2011 WL 13150535, at *2 (N.D. Ind. Oct. 20, 2011).

Determining whether to grant a Section 1782 application is a two-step analysis. First, the court must consider whether the statutory prerequisites are satisfied: (1) the person from whom discovery is sought must reside or be found in the district in which the application is filed; (2) the request must seek evidence, whether the "testimony or statement" of a person or production of "a document or other thing"; (3) the discovery must be for use in a proceeding in a foreign or international tribunal; and (4) the application must be made by an "interested person." *In re Medytox, Inc.*, No. 1:18-mc-00046-TWP-DLP, 2019 WL 3162174, at *3-4 (S.D. Ind. July 16, 2019), *report and recommendation adopted*, 2019 WL 3556930 (S.D. Ind. Aug. 5, 2019).

Second, if the statutory requirements are met, the court considers whether or to what extent the Section 1782 request is appropriate. *Id.* at *4. The Supreme Court has articulated four discretionary factors to guide this analysis: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, court, or agency to U.S. judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the Section 1782 request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65. Consideration of the *Intel* factors is a "discretionary balancing" exercise. *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 146 (2d Cir. 2024). No single factor is dispositive.

**B.    The Application Satisfies the Statutory Requirements of 28 U.S.C. § 1782**

The Application clearly satisfies Section 1782's statutory requirements: (1) Respondents reside or are otherwise found in the Southern District of Indiana; (2) the application seeks

"evidence," in the form of documents and communications related to Mkrtchyan and the organized Campaign against him; (3) the discovery sought is for use in pending or contemplated proceedings in England and Wales; and (4) Mkrtchyan is an "interested person" as the claimant in the pending and contemplated proceedings in England and Wales.

### 1.    *Respondents Are "Found" in the Southern District of Indiana*

The Application meets the first statutory requirement under Section 1782.  Respondents Akard and Bose McKinney are found in the Southern District of Indiana.  Although the Seventh Circuit "has not yet explicitly addressed the meaning of 'resides or is found' in [Section 1782]," this Court has held that "a person or entity 'resides or is found' in a district when it is subject to personal jurisdiction within that district."  *In re Sabag*, No. 1:19-MC-00084-JPH-TAB, 2022 WL 17687905, at *2 (S.D. Ind. Dec. 15, 2022) (citing *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019)).  This Court has personal jurisdiction over Respondents: Akard resides and practices law in Indianapolis and thus can be "found" in the District, and Bose McKinney & Evans and Bose Public Affairs Group are a domestic Indiana limited liability partnership and company, respectively, their principal offices are located in Indianapolis, and their registered agents are located at the same Indianapolis address.  Hartman Decl. ¶¶ 7-8, 12, Exs. 5-6, 10.  *See In re Kurbatova*, No. 18-MC-81554, 2019 WL 2180704, at *2 (S.D. Fla. May 20, 2019) (a respondent was "found" in the district because it "maintains a registered agent that is located in this district who can accept service of process"); *In re Edelman*, 295 F.3d at 179 ("[T]he Supreme Court authorized the exercise of personal jurisdiction based on nothing more than physical presence . . . [and] we do not think that § 1782(a), which is simply a discovery mechanism and does not subject a person to liability, requires more.").  Therefore, all Respondents are "found" in the Southern District of Indiana for the purposes of Section 1782.

14

### 2. The Application Seeks "Evidence" in the Form of Non-Privileged "Documents" Held by Respondents

There is no question that the Application seeks "evidence": it seeks non-privileged documents concerning Mkrtchyan and the orchestrated disinformation Campaign against him.[3] Specifically, Mkrtchyan seeks documents relating to him that were generated as a result of Akard's lobbying, public relations, and other services he provided to Shadmanov and UCG (as opposed to any privileged communications he may have had with his clients). Accordingly, the second statutory requirement is met. *See In re Medytox, Inc.*, 2019 WL 3162174, at *4 (the second statutory requirement was met because "the application seeks evidence, specifically in the form of [respondent's] deposition testimony and 13 requests for production").

The fact that Mkrtchyan seeks evidence from Shadmanov and UCG's attorneys is no impediment to granting the Application. Courts routinely grant discovery requests for factual information and non-privileged communications held by attorneys or law firms, and even confidential information generated in the course of a law firm's lobbying (as opposed to legal) representation of a client. *See, e.g.*, *In re SBK ART LLC*, No. 24 Misc. 147 (PAE) (RFT), 2025 WL 1537474, at *10 (S.D.N.Y. May 30, 2025); *In re Lane*, No. 22 Misc. 34 (LGS), 2022 WL 16737132, at *4-5 (S.D.N.Y. Nov. 7, 2022); *In re Degens*, No. 20-mc-237 (JGK) (RWL), 2020 WL 4252725, at *6 (S.D.N.Y. July 24, 2020) (granting Section 1782 request for discovery of business-related information from law firms and emphasizing that "law firms are not immune from discovery"). And here, Akard admits he and his firm were engaged to provide services to UCG

---

[3] Mkrtchyan has no interest in obtaining privileged documents and has tailored his proposed subpoenas to make clear that he is not seeking privileged information. *See* Tait Decl. ¶ 25.

"with respect to certain legal *and related matters* impacting their global operations." Pet's Decl. ¶ 22 (emphasis added).

Any purported privilege claims are premature and should not be a basis to deny a Section 1782 application at this stage; rather, they should be addressed on a document-by-document basis pursuant to the Federal Rules of Civil Procedure. *See In re Lane*, 2022 WL 16737132, at *3-5; *In re Veiga*, 746 F. Supp. 2d 8, 26 (D.D.C. 2010) (granting Section 1782 application and finding that the parties' arguments concerning privilege were premature); *see also In re Kuwait Ports Auth.*, No. CV 22-MC-64 (RJL), 2025 WL 1529798, at *4 (D.D.C. May 29, 2025) ("While the subpoenas do seek information that could be protected by attorney-client privilege, it is premature based on the record before the Court to make privilege determinations at this stage.").

Respondents' communications with third parties about Mkrtchyan would not be privileged. And moreover, at least some of Respondents' activities—writing letters to senior Uzbek officials to disparage Uzbek citizens, or sending communications to other third parties regarding Mkrtchyan—were lobbying or public relations activities, rather than legal advice or services, and therefore are likely to fall outside of any attorney-client privilege for this additional reason.

### 3.    *The Discovery Sought Is for Use in Pending or Contemplated Proceedings in a Foreign Tribunal*

The Application meets the third statutory requirement under Section 1782: that the discovery be "for use" in proceedings in a foreign or international tribunal. Mkrtchyan seeks discovery from Respondents "for use in" the pending and contemplated proceedings in the English and Welsh courts. Tait Decl. ¶¶ 3, 20 (confirming that the discovery sought here is "for use in" the pending and contemplated English proceedings); Pet's Decl. ¶¶ 40-41.

Evidence that is relevant to a foreign proceeding meets Section 1782's "for use" requirement. *In re Semrush SM LLC*, No. 1:22-mc-00045-JRS-MJD, 2022 WL 3084601, at *3

16

(S.D. Ind. July 6, 2022), *report and recommendation adopted*, 2022 WL 3083487 (S.D. Ind. Aug. 3, 2022) (the requested discovery was "for use in" a foreign proceeding because the requested documents were relevant to the Russian litigation).  The burden on the applicant to make this showing is "de minimis." *In re Veiga*, 746 F. Supp. 2d at 18.  The applicant need only demonstrate that the discovery sought is "minimally relevant" to the foreign proceeding.  *In re BonSens.org*, 95 F.4th 75, 80 (2d Cir. 2024); *see also Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015) ("Under § 1782, an applicant may seek discovery of any materials that can be made use of in the foreign proceeding to increase her chances of success.").

The proceeding for which the discovery is sought need not be "pending" or even "imminent."  The Supreme Court has made clear that it is enough for the foreign proceeding to be "within reasonable contemplation." *Intel*, 542 U.S. at 259.  Section 1782's statutory requirements are met as long as contemplated proceedings are "not merely speculative or just a twinkle in counsel's eye." *In re Sabag*, No. 1:19-mc-00084-JPH-TAB, 2021 WL 1634781, *4 (S.D. Ind. Apr. 26, 2021) (quotations omitted); *In re Consorcio Ecuatoriano de Telecomunicaciones S.A.*, 747 F.3d 1262, 1271 (11th Cir. 2014); *SPS Corp I, Fundo de Investimento em Direitos Creditórios Nao Padronizados v. General Motors Co.*, 110 F.4th 586, 591 (3d Cir. 2024).

This criterion, too, is easily satisfied here. The requested discovery is relevant to pending and contemplated proceedings in the English courts. Tait Decl. ¶ 15.

<u>Pending English proceedings</u>.  As stated above, in April 2025, Mkrtchyan's English lawyers initiated civil libel proceedings against the owners of *The London Post* and Stirling in the King's Bench Division of the High Court, and are asking the English courts to decide that the published content is part of a broader disinformation campaign against Mkrtchyan.  Mkrtchyan seeks discovery in this Section 1782 Application about that disinformation Campaign, in which

Respondents have participated.  *Id.* ¶ 20; Pet's Decl. ¶¶ 38-41.  The evidence sought is plainly relevant to the pending foreign proceedings.  Accordingly, the requested discovery is warranted.

        <u>Contemplated English and Welsh proceedings</u>.  Mkrtchyan also intends to bring additional claims in England related to the activities of the Campaign, including an anticipated claim for a conspiracy.  Tait Decl. ¶¶ 3-4, 14, 18-20; Pet's Decl. ¶¶ 12, 37, 40-41.  These proceedings are within reasonable contemplation.  As Mkrtchyan attests in his sworn declaration, he has retained his existing counsel in England to represent and advise him on those claims and to file them as soon as possible.  Pet's Decl. ¶ 41.  *See Sabag*, 2021 WL 1634781, at *3 ("reasonable contemplation" standard met where petitioner provided sworn statement that he intended to pursue foreign proceedings); *id.* at *3-4 (instruction of foreign counsel to conduct factual investigation and legal analysis was sufficient to show that proceedings were reasonably contemplated).  And the requested discovery would be relevant to those contemplated proceedings and conspiracy claims.  Mkrtchyan seeks evidence about Respondents' relationships, interactions, and activities in connection with the Campaign, including any interactions between Respondents and *The London Post* and its owners; and any contact between Respondents and Stirling, or others involved in the efforts to harm Mkrtchyan.  Mkrtchyan also seeks non-privileged materials related to Respondents' efforts in connection with the Campaign, including actions on behalf of UCG or Shadmanov, to disseminate false information about Mkrtchyan.

        Accordingly, the requested discovery is undoubtedly "for use" in a foreign proceeding.

### 4.    *Mkrtchyan Is an Interested Person*

        Mkrtchyan meets the fourth statutory requirement under Section 1782.  As the claimant in the English civil proceedings, Mkrtchyan "[n]o doubt . . . may be the most common example of . . . the 'interested person [s]' who may invoke § 1782."  *Intel*, 542 U.S. at 256.

### C.    The *Intel* Discretionary Factors Favor Authorizing the Requested Discovery

#### 1.    *The First Factor Favors Granting the Application*

The first *Intel* factor—whether the respondent is a participant in the foreign proceeding—favors granting discovery.  When the respondent is participating in the foreign proceeding, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."  *Id.* at 264.  By contrast, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Id.*

Here, Respondents are not parties to the English proceedings, and there are significant jurisdictional obstacles to bringing claims against American defendants in England and Wales, particularly in actions for libel.  Tait Decl. ¶ 21.  Thus, the first *Intel* factor favors authorizing the requested discovery.  *In re Sabag*, 2022 WL 17687905, at *3; *In re Semrush SM LLC*, 2022 WL 3084601, at *3 (because the petitioner was "not a party to the Russian Litigation and is beyond the jurisdictional reach of the Russian court," "the first factor supports [petitioner's] discovery request under § 1782").

#### 2.    *The Second Factor Favors Granting the Application*

"The second discretionary factor looks to whether the foreign court would accept assistance from federal district courts."  *In re Medytox, Inc.*, 2019 WL 3162174, at *5.  Courts have held that this factor weighs in favor of granting the application unless there is "authoritative proof" that the foreign court would oppose such assistance.  *Id.* (citation omitted).  Typically, a respondent bears the burden of presenting such proof.  *See id.* at *6.

Here, no "authoritative proof" that the English court would oppose assistance from a federal court exists.  To the contrary, U.S. courts "routinely find that 'courts in the United Kingdom … are [] receptive to Section 1782 discovery.'"  *In re BM Brazil 1 Fundo de Investimento em*

*Participacoes Multistrategia*, No. 23 Misc. 208, 2024 WL 555780, at *11 (S.D.N.Y. Jan. 18, 2024), *report and recommendation adopted sub nom.*, 2024 WL 554302 (S.D.N.Y. Feb. 12, 2024); *see also Frasers Grp. PLC v. Gorman*, No. 23 Misc. 348 (PAE), 2023 WL 6938284, at *3 (S.D.N.Y. Oct. 19, 2023) ("England is generally receptive to § 1782 discovery requests."); *LEG Q LLC v. RSR Corp.*, No. 3:17-cv-1559-N-BN, 2017 WL 3780213, at *9 (S.D. Tex. Aug. 31, 2017) (finding no "clear directive or authoritative proof that the English High Court would reject evidence obtained with the aid of Section 1782"). Indeed, in *In re Sarrio S.A.*, the court noted an opinion by England's House of Lords (its highest judicial body) expressly approving a private litigant's use of § 1782 request to gather evidence in the United States for use in an English proceeding. 173 F.R.D. 190, 197 (S.D. Tex. 1995). These observations by American courts are consistent with the declaration of Mkrtchyan's English counsel, who states that courts in England are generally receptive to evidence gathered as part of the Section 1782 process and have not, to his knowledge, issued any directive against such evidence. Tait Decl. ¶ 24.

Accordingly, the second *Intel* factor also favors authorizing the requested discovery.

### 3. The Third Factor Favors Granting the Application

The third *Intel* factor asks whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States. This factor is distinct from whether discovery would be allowed in the foreign jurisdiction. *See Intel*, 542 U.S. at 261 ("[C]omity and parity concerns … do not permit our insertion of a generally applicable foreign-discoverability rule into the text of § 1782(a)."). Instead, "[w]hen analyzing this factor, courts regularly look to see if granting the application would undermine a proof-gathering *policy* of the foreign tribunal." *In re Medytox, Inc.*, 2019 WL 3162174, at *6.

Mkrtchyan's Application does not attempt to evade English law or public policy. Tait Decl. ¶ 25. As noted above, English courts are receptive to discovery obtained through Section

20

1782 applications. Additionally, Mkrtchyan's subpoenas do not seek information protected by the attorney-client privilege (*id.*), but instead allow Respondents to provide a privilege log consistent with the Federal Rules. Thus, the third *Intel* factor favors authorizing the requested discovery.

### 4.    *The Fourth Factor Favors Granting the Application*

The last *Intel* factor concerns whether the discovery sought is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65. Section 1782 does not establish a standard for discovery. *Texas Keystone, Inc. v. Prime Nat. Res., Inc.*, 694 F.3d 548, 554 (5th Cir. 2012). Instead, it is a screening mechanism "designed for preventing abuses of the *right* to conduct discovery in a federal district court for use in a foreign court." *Heraeus Kulzer, GmbH*, 633 F.3d at 597 (emphasis added). "Once the court has determined that such abuses are unlikely, the ordinary tools of discovery management, including Rule 26, come into play; and . . . [S]ection 1782 drops out." *Id.*; *see also In re On Otomasyon*, 2011 WL 13150535, at *2 ("Because the specific discovery requests are not yet before the Court, the Court cannot factor in whether the requests themselves are unduly intrusive or overly burdensome.").

Here, the requested discovery in the proposed subpoenas is limited to discrete topics and entities relevant to the English claims. Tait Decl. ¶ 15 (confirming the discovery sought is relevant). The subpoenas seek documents from Respondents relating to a single individual (Mkrtchyan) and within narrow topics related to the disinformation Campaign. Given the limited scope of this relevant discovery, the information is proportional to the needs of the English claims, considering the importance of the issues, the importance of the discovery in resolving these issues, the potential amounts in controversy, the parties' resources and relative access to relevant information, and whether the burden or expense of the discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b). The damage that Mkrtchyan has suffered as a result of the broader Campaign exceeds $10 million (Pet's Decl. ¶ 42), much of the evidence of the Campaign is naturally in the

exclusive possession of its participants and their agents (not Mkrtchyan), and discovery is needed to obtain it so that it can be used in litigation.  Accordingly, the fourth *Intel* factor favors granting the discovery.

## IV.    CONCLUSION

Because the Application satisfies the Section 1782 statutory requirements and the *Intel* factors favor granting discovery, the Court should grant the Application and authorize the requested discovery.


Dated: August 4, 2025                                    Respectfully submitted,

                                                         */s/ Scott E. Murray*
                                                         Scott E. Murray (#26885-49)
                                                         HOOVER HULL TURNER LLP
                                                         111 Monument Circle, Suite 4400
                                                         Indianapolis, IN 46204
                                                         Telephone: (317) 381-5635
                                                         Email: smurray@hooverhullturner.com

                                                         Ryan P. Hartman
                                                         ARNOLD & PORTER KAYE SCHOLER LLP
                                                         700 Louisiana Street, Suite 4000
                                                         Houston, TX 77002-2755
                                                         Telephone: (713) 576-2438
                                                         Email: Ryan.Hartman@arnoldporter.com

                                                         *Attorneys for Petitioner Ovik Mkrtchyan*