IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| IN RE APPLICATION OF OVIK MKRTCHYAN FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:25-mc-00041 |

## DECLARATION OF NIGEL TAIT

Pursuant to 28 U.S.C. § 1746, I, Nigel Tait, declare as follows:

1.      I am the Managing Partner of Carter-Ruck LLP and a solicitor in the Senior Courts of England and Wales. My firm represents Petitioner Ovik Mkrtchyan in England and Wales. We currently represent Mr. Mkrtchyan in two separate matters proceeding in the King's Bench Division of the High Court of England and Wales, namely: (1) libel proceedings against 2Trom Media Group and Viktor Tokarev; and (2) libel proceedings against Radha Stirling (the "Claims"). The Claims were both issued (initiated) on 22 April 2025, and Mr. Mkrtchyan is the Claimant in both matters. The High Court is a tribunal of first instance that hears evidence, including evidence from abroad, and adjudicates claims.

2.      I submit this declaration in support of Mr. Mkrtchyan's Application for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782 (the "Application"). I make this declaration based on my personal knowledge except where otherwise indicated.

3.      As explained below, the Application seeks discovery under Section 1782 for use in the Claims, as well as contemplated proceedings involving an alleged conspiracy to injure Mr. Mkrtchyan.

4. Both his existing and contemplated claims are expected to be based in part on any supporting evidence of a broader coordinated disinformation campaign and tortious conspiracy that is gathered as part of the Application.

### I. Qualifications

5. I am the Managing Partner and Head of Media Law at Carter-Ruck. I have been licensed to practice law in England and Wales since 1988.

6. I joined Carter-Ruck (then-called Peter Carter-Ruck and Partners) in 1986 as a trainee. I qualified at the firm in 1988 and have been the Managing Partner and Head of Media Law at the firm for over ten years, specializing in reputation, media, privacy and commercial litigation.

7. My practice primarily encompasses media disputes involving libel, misuse of private information and data protection. Carter-Ruck acts for both claimants and defendants in these matters. I have also acted for clients in commercial litigation, including breach of contract and professional negligence.

### II. Pending and Contemplated Proceedings in England

8. On 22 April 2025, this firm filed the Claim forms on behalf of Mr. Mkrtchyan in the Claims.

9. The first Claim (the "London Post Proceedings") relates to the publication of an article on the website "The London Post" entitled "Corruption Networks of Uzbekistan: From Washington to Tashkent" on 19 October 2024. The Article remains accessible at the following URL: https://london-post.co.uk/corruption-networks-of-uzbekistan-from-washington-to-tashkent. The London Post is an online content hosting platform. The defendants in the London Post Proceedings are 2Trom Media Group and Viktor Tokarev of Moscow Media Group. On

information and belief, 2Trom Media Group owns and publishes The London Post, and Tokarev is its sole director. The claim seeks damages, including aggravated damages and exemplary damages, injunctive relief, and other statutory remedies for libel arising from the publication of the London Post Article.

10. The second Claim (the "Stirling Proceedings") relates to the publication of an article by Stirling on her website "Radha Stirling", and on a series of other websites and social media platforms owned and/or operated by her, entitled "US Lobbyists used in plot to destabilise US relations with Uzbekistan and steal Central Asia's largest cement holding" on 18 January 2025. The Article was first published at the following URL: https://www.radhastirling.com/single-post/uslobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-stealcentral-asia-s-large and was republished across several platforms owned and operated by Stirling. The defendant in the Stirling Proceedings is Stirling, a public relations consultant who, on information and belief, is based outside the U.S. The claim seeks damages, including aggravated damages, injunctive relief, and other statutory remedies for libel arising from the publication of the aforementioned content.

11. A true and correct copy of the claim form initiating the Claim in the London Post Proceedings is attached as **Exhibit 1**.

12. A true and correct copy of the claim form initiating the Claim in the Stirling Proceedings is attached as **Exhibit 2**.

13. Particulars of Claim were served in the Stirling Proceedings on 6 June 2025 and a true and correct copy is attached as **Exhibit 3**. Particulars of Claim were served in the London Post Proceedings on 12 June 2025, and a true and correct copy is attached as **Exhibit 4**.

14. Without waiving privilege, my firm is also currently instructed by Mr. Mkrtchyan in connection with contemplated additional civil proceedings in England and Wales including, without limitation, tortious conspiracy and further libel claims in respect of additional defendants who caused the publications in the London Post Proceedings and the Stirling Proceedings to be published, and/or caused, participated in or authorized the publication of any other publications forming part of the campaign. It is contemplated that such proceedings would also proceed in England and Wales.

### III. The Discovery Sought by the Application

15. In my capacity as solicitor for Mr. Mkrtchyan in connection with the pending and contemplated proceedings in England and Wales, I consider that the discovery sought from Respondents is relevant to these proceedings, as explained in more detail below.

16. Mr. Mkrtchyan asserts, and we intend to ask the English courts to conclude, that following his wrongful detention in early 2024 and since at least mid-2024, Mr. Mkrtchyan has been the target of a coordinated disinformation campaign carried out against him and his family members and business associates, escalating from August 2024 onwards (the "Campaign").

17. As part of this, Mr. Mkrtchyan asserts that individuals and entities with a connection to the Campaign include: 2Trom Media Group and Viktor Tokarev, owners of The London Post (defendants in the London Post Proceedings); Stirling (defendant in the Stirling Proceedings); Stephen Payne (an individual in Texas, acting himself and through his affiliated companies); Ulugbek Shadmanov (an apparent client of Stirling), Shadmanov's company United Cement Group ("UCG"), and their other agents and persons with a vested interest in causing reputational damage to Mr. Mkrtchyan, including, but not limited to, Respondents Stephen Akard

and his law and public affairs firm Bose McKinney & Evans LLP and Bose Public Affairs Group LLC (advising Shadmanov and UCG on legal and non-legal matters).

18. Mr. Mkrtchyan seeks to redress the harm caused by the Campaign in both pending and contemplated proceedings in England and Wales. He has filed civil libel claims against two participants—the owners of The London Post and Stirling—and we anticipate pursuing additional claims, including claims for libel and in the tort of conspiracy, against defendants subject to jurisdiction in England, and/or including additional defendants in the pending proceedings. In both of the pending proceedings in England and Wales, Mr. Mkrtchyan argues in support of his claim for aggravated damages that the respective defendants did not publish the offending statements as part of an exercise in legitimate and responsible journalism (and/or, in Stirling's case, an exercise in disinterested policy activism). His case is that the defendants in the Claims were aided, funded and/or encouraged to publish by others involved in the Campaign, including individuals whom he cannot presently identify. It is also believed that these individuals caused the publication of other defamatory third-party publications relating to Mr. Mkrtchyan.

19. In English law, letters to governments and/or government officials may found a claim in defamation or conspiracy, subject to the availability of any defences. A defence of qualified privilege may subsist in respect of a claim in defamation, but not a claim in conspiracy. A qualified privilege defence to a defamation complaint over a given publication (on the basis of it making a report to the appropriate authorities or otherwise) would, if Mr. Mkrtchyan's case as to the existence of the Campaign were accepted, be likely to be defeated by proof of malice.

20. Mr. Mkrtchyan's existing and contemplated claims will be based in part on any supporting evidence that is gathered as part of this Application which demonstrates a broader coordinated disinformation campaign and conspiracy to injure. Based on my review of the

discovery requests that Mr. Mkrtchyan intends to make if his Application is granted, the discovery that he seeks is for use in his pending and contemplated claims.

21. The Respondents are not parties to the English proceedings, and there are significant jurisdictional obstacles to bringing claims in England and Wales against defendants domiciled outside England in the United States, particularly in actions for libel, including s.9 of the Defamation Act 2013 and the provisions of Part 6 of the English and Welsh Civil Procedure Rules 1998 (namely rules 6.36 and 6.37 relating to service of the claim form outside the jurisdiction).

22. Mr. Mkrtchyan has no known way to obtain this information from the Respondents for use in the English and Welsh courts other than through the 1782 assistance of the U.S. court.

23. Nor could Mr. Mkrtchyan compel the production of the requested information through the disclosure (discovery) available in the English proceedings, given that Respondents are not parties to these proceedings and the requested information goes beyond any material which might likely be the subject of disclosure obligations on the part of the defendants in the London Post Proceedings and the Stirling Proceedings.

IV. **English Courts Accept Evidence Obtained Through Section 1782 Proceedings in U.S. Courts**

24. Courts in England are generally receptive to information obtained through Section 1782 requests. The (then) highest Court in England and Wales, the House of Lords, in ***South Carolina Insurance Co. v. Assurantie Maatschappij De Zevem Provinvci en NV*** [1987] AC 24, a case concerned with an attempt to obtain an injunction to prevent the use of the procedure to provide pre-trial discovery, referred to the fact that any party preparing their case in the High Court is entitled to exercise such a right under U.S. law. A modern example is ***Nigeria v Process and Industrial Developments Ltd*** [2020] EWHC 2379 (Comm), where the Court granted an extension

of time to the Federal Republic of Nigeria to challenge an arbitration award on grounds of fraud, referring in the course of its decision to the fact that evidence obtained through a Section 1782 Request made in the U.S. District Court for the Southern District of New York gave rise to a *prima facie* case in this regard. Accepting such assistance is consistent with English law regarding libel and conspiracy, which seeks to provide an avenue for redress for injured claimants. I am unaware of any directive given by the courts of England and Wales indicating that they would not be receptive to the judicial assistance requested in the Application.

25. The Application is also consistent with English and Welsh law and public policy. For example, it does not seek any information protected by a privilege, such as legal advice privilege, or any information which is irrelevant to the issued and contemplated proceedings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 1, 2025.

_____
Nigel Tait