# Exhibit 3

IN THE HIGH COURT OF JUSTICE          <u>Claim no. KB-2025-001385</u>
KING'S BENCH DIVISION
MEDIA AND COMMUNICATIONS LIST

**B E T W E E N :**

**OVIK MKRTCHYAN**

<u>Claimant</u>

- and -

**RADHA STIRLING**

<u>Defendant</u>

---

**PARTICULARS OF CLAIM**

---

<u>Parties</u>

1. The Claimant is a businessman and entrepreneur. He is the sole shareholder of Gor Investment Ltd (Company number 03820831) ("**GIL**"), the parent company of a diverse portfolio of companies based in the UK, Uzbekistan and Canada. He is also a shareholder of five other UK-based companies, including the UK-registered company Gor Logistic Limited (Company number 04547356) ("**GLL**"), of which the Claimant is the sole shareholder. He resides in Latvia and holds Armenian and Cypriot citizenship.

2. The Defendant:

    2.1. is the owner and operator of [www.radhastirling.com](www.radhastirling.com), [www.dueprocess.international](www.dueprocess.international), [www.detained-in-dubai.prowly.com](www.detained-in-dubai.prowly.com) and [www.ipexreform.com](www.ipexreform.com) ("**the Defendant's Websites**");

    2.2. is the sole Director and shareholder of Stirling and Partners Limited (Company number 12379168), Detained In Dubai Limited (Company number 12145991), and Radha Stirling Limited (Company number 11247852); and

2.3. operates at least 11 different websites including those listed at paragraph 2.1 above, and associated accounts on YouTube and the social media platforms Facebook, X (Twitter), and LinkedIn. The Defendant's commercial activities include offering legal, public affairs, and communications services, and she holds herself out as offering *"strategic"*, *"consulting"* and *"campaign management"* services.

**The words complained of**

3. On or about 16 January 2025, the Defendant published an article on her website, radhastirling.com, entitled "*US Lobbyists used in plot to destabilise US relations with Uzbekistan and steal Central Asia's largest cement holding*" ("**the Article**"). It was published at the following URL: https://www.radhastirling.com/single-post/us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asia-s-large ("**Publication 1a**").

4. The Defendant further published and/or re-published the Article on other Websites operated by her and/or for which she is responsible as a matter of law, in materially identical terms, as follows:

    4.1. On or about 16 January 2025, the Defendant published the Article on the website detained-in-dubai.prowly.com. It was accessible at the following URL (but has since been taken down): https://detained-in-dubai.prowly.com/376068-us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asias-largest-cement-holding ("**Publication 2**").

    4.2. On or about 17 January 2025, the Defendant published the Article on the website dueprocess.international. It remains accessible at the following URL: https://www.dueprocess.international/post/us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asia-s-large ("**Publication 3"**).

4.3. On or about 18 January 2025, the Defendant published the Article on the website ipexreform.com. It was accessible at the following URL (but has since been taken down): https://www.ipexreform.com/post/us-lobbyists-used-in-plot-to-destabilise-us-relations-with-uzbekistan-and-steal-central-asia-s-large ("**Publication 4**").

5. The Article contained the following underlined words defamatory of and concerning the Claimant ("**the Words Complained Of**"):

"Aripov's key business partner is Russian citizen and Oligarch, **Ovik Mkrtchyan**, the head of GOR Investments for which former US Energy Secretary, Rick Perry and Mike Pompeo are members of the advisory board. Mkrtchyan was detained in Uzbekistan in January 2024 on corruption related charges, **reportedly having transferred more than a billion dollars** to offshore accounts.

Payne is a registered lobbyist for Aripov whose allies, Pompeo and Perry, sit on the board of his client's business partner's (Oligarch Ovik Mkrtchyan) company who was arrested over corruption allegations. He has been accused of embezzling the company's wealth after appropriating Asia Alliance Bank from Gulnara Karimova, the former President's daughter, and establishing dozens of offshore companies.

…

Corruption in Uzbekistan
Influential but corrupt people within Uzbekistan, who are close to the political opposition, with links to Russian organised crime and a history of appropriating businesses are targeting an investor for his business and assets.

…

US Interests
"When we have people like Stephen Payne, Mike Pompeo, Rick Perry and Congressman Wesley Hunt linked to oligarchs who are trying to steal control and assets by any means and to the extent they were willing to throw millions at Americans, you end up with individuals misusing their diplomatic powers for

3

<blockquote>
their own financial benefit, even if that undermines United States interests with Uzbekistan as a whole."
</blockquote>

6. The words in bold type were hyperlinked to an article on td-partner.com dated 28 December 2024, entitled *"Billions in Offshores: How Ovik Mkrtchyan Withdrew Uzbekistan's Wealth"*, which was accessible at [https://td-partner.com/novosti/item/106960-billions-in-offshores-how-ovik-mkrtchyan-withdrew-uzbekistan-s-wealth](https://td-partner.com/novosti/item/106960-billions-in-offshores-how-ovik-mkrtchyan-withdrew-uzbekistan-s-wealth) ("**the Hyperlinked Article**").

7. On an unknown date, the Defendant amended Publication 1a. However, the amended version ("**Publication 1b**") contained the following underlined defamatory words of and concerning the Claimant:

<blockquote>
"Aripov's key business partner is the head of GOR Investments for which former US Energy Secretary, Rick Perry and Mike Pompeo are members of the advisory board **reportedly having transferred more than a billion dollars** to offshore accounts.

…

US Interests

"When we have people like Stephen Payne, Mike Pompeo, Rick Perry and Congressman Wesley Hunt linked to oligarchs who are trying to steal control and assets by any means and to the extent they were willing to throw millions at Americans, you end up with individuals misusing their diplomatic powers for their own financial benefit, even if that undermines United States interests with Uzbekistan as a whole." ("**the Further Words Complained Of**")
</blockquote>

8. The words in bold type were also hyperlinked to the Hyperlinked Article.

**Defamatory meaning**

9. The Words Complained Of, published in Publications 1a, 2, 3 and 4, in their natural and ordinary meaning and when read in the full context of the respective publications meant and were understood to mean that:

4

> The Claimant is guilty of corruption in that he used his companies, Asia Alliance Bank (which he appropriated from Gulnara Karimova) and Gor Investment, to embezzle more than a billion dollars, which he transferred into dozens of offshore accounts he created for this purpose, and in that he bribed high-profile U.S. officials.

10. The Further Words Complained Of, published in Publication 1b, in their natural and ordinary meaning and when read in the full context of the amended article, meant and were understood to mean that:

> The Claimant is guilty of corruption in that he embezzled more than a billion dollars by transferring it to dozens of offshore accounts, and in that he bribed high-profile U.S. officials.

11. Further or alternatively, by way of innuendo, ordinary and reasonable readers of Publication 1b in possession of knowledge of the fact that the Claimant is head of GIL, would understand the Further Words Complained Of to carry the meaning pleaded at paragraph 10 above.

**Serious harm under s.1(1) of the Defamation Act 2013**

12. Publication of the Article (in its original form and as amended) has caused, or is likely to cause, serious harm to the Claimant's reputation.

**PARTICULARS OF SERIOUS HARM**

12.1. The imputations pleaded at paragraphs 9 and 10 above are salacious, grave and inherently likely to cause harm to both the Claimant's personal and professional reputations. The Defendant accuses the Claimant of organised, serious and sustained criminality and corruption, involving the embezzlement of over one billion dollars and bribery of high-profile U.S. officials.

5

12.2. The true extent of publication is not yet known. However, pending disclosure, the inference will be invited that Publications 1a, 1b, 2, 3 and 4 have each been published to a substantial but unquantifiable number of people in this jurisdiction and around the globe, as:

12.2.1. The Defendant is a public figure with a large online following. She has 9,744 followers on Twitter (@RadhaStirling), 1,327 followers on Instagram (@radhastirling) and 374 subscribers on YouTube (@radhastirling2991). It is to be inferred that the Defendant's Websites attract a similarly high number of regular readers.

12.2.2. The Article was published on several platforms operated by the Defendant.

12.2.3. On 17 January 2025, the Defendant (via her Twitter/ X account @RadhaStirling) published the following tweet promoting Publication 3, which tagged prominent and influential news sites. It received three likes and has been viewed c.300 times:

"US Lobbyists used in plot to destabilise US relations with [#Uzbekistan](#Uzbekistan) and steal Central Asia's largest cement holding [@ICIJorg](@ICIJorg) [@TheDiplomatMag](@TheDiplomatMag) [@CNNBusiness](@CNNBusiness) [@IBTimes](@IBTimes) [@ReutersBiz](@ReutersBiz) [hyperlink to Publication 3]".

12.3. The Claimant does not court media attention and, prior to the publication of the Article, there were very few articles about him published online, and no articles critical of the Claimant on any website or social media platform as prominent as those operated by the Defendant. As such, the Court will be asked to infer that readers would only learn of the imputations concerning the Claimant identified at paragraphs 9 and 10 above from the Defendant's numerous publications of the Article.

12.4. On 21 January 2025, UK financial provider 'Emerald24' refused to open an account for GIL, without giving any reasons. This refusal was communicated to GIL's representatives within days of the publication of Publications 1a, 1b (if amended prior to this date), 2, 3 and 4. The Court will be asked to infer that, in the circumstances, GIL was refused banking services because of harm caused to the Claimant's reputation arising from the Article. The Claimant will rely on the following facts and matters in support of the inference:

12.4.1. the absence of significant prior media attention or interest in the Claimant, as to which paragraph 12.3 above is repeated;

12.4.2. the exacerbation of any pre-existing scrutiny of, or interest in, the Claimant by the publication of the Defendant's articles.

12.4.3. the Defendant's publication and republication of the Article on such a wide scale made it likely that it would have been available to businesses offering banking and financial services, where they conducted regulatory and compliance checks;

12.4.4. the Claimant's very close association with both GIL and the similarly named GLL, as sole shareholder of both companies, and the direct references in the Article to both GIL and the Claimant; and

12.4.5. the coincidence in time between the Defendant's publications and the refusal of banking services.

12.5. On 31 December 2025, Revolut Bank ("**Revolut**") requested information about the Claimant's involvement with GLL within 21 days as part of a compliance investigation, which was required to maintain access to the account. GLL's bank account was suspended before the expiry of that period, on 6 January 2025. GLL's representative provided the requested information on 13 January 2025. Subsequently, after the Defendant's Publications were published:

12.5.1. In the second half of February 2025, Revolut informed two companies which were affiliated with GLL, and which held accounts with it, that they would be subject to an account closing procedure.

12.5.2. GLL's representative was notified on 14 March 2025 that Revolut would no longer offer its banking services and would be closing both GLL's account and the personal account of a family member.

12.5.3. The Court will be asked to infer that, in the circumstances, these banking services were definitively withdrawn by Revolut because of harm caused to the Claimant's reputation arising from publication of the Article, and because of the association of the account holders with the Claimant and the allegations in the Article. The Claimant will rely on paragraphs 12.4.1– 12.4.5, which are repeated *mutatis mutandis,* in support of this inference.

12.6. GIL was provided with banking services in this jurisdiction by UK Bank '3S Money'. On 27 March, 3S Money refused a request for GLL to open an account. GIL's own banking services were withdrawn by 3S Money on 7 April 2025, and its account closed, on the basis that the provision of such services no longer aligned with the bank's risk appetite, it having made express reference to publicly available sources raising compliance issues. The Court will be asked to infer that, in the circumstances, GIL's banking services were withdrawn and GLL was refused banking services because of harm caused to the Claimant's reputation arising from the Article. Paragraphs 12.4.1– 12.4.5 above are repeated *mutatis mutandis* in respect of the refusal and withdrawal of services from GLL and GIL.

12.7. The Defendant holds herself out publicly as an expert in, *inter alia*, matters of extradition, corruption and human rights abuses, with a particular focus on matters concerning the Middle East. Further, her website dueprocess.international purports to hold criminals, corporations, law

8

enforcement organisations and governments accountable. It is to be inferred that readers of her websites would consider the Claimant to have been exposed as a wrongdoer by the Defendant, who was seeking to hold him to account for corruption and abuse of power.

12.8. The allegations are presented as factual and truthful. The Defendant did not include any denials on the part of the Claimant or any other information which might cast doubt on the claims, including in respect of Publications 1b and 3 which remain live, despite being on notice of the Claimant's strong denials since receiving the letter of claim on 12 January 2025.

12.9. The Claimant will rely on the grapevine effect.

**Relief**

**(a) Damages**

13. In support of the Claimant's claim for general and/or aggravated damages, he will rely upon the following facts and matters:

13.1. Paragraphs 12.1 – 12.9 above are repeated.

13.2. Publication of the words complained of at Publications 1a, 1b, 2, 3 and 4 has caused the Claimant to suffer very significant distress. The Claimant feels that his life and the lives of his family members have been endangered by the publication of the Article, which, given the extremely serious nature of the imputations it contains, is likely to prompt adverse responses to them from state and state security service actors.

13.3. The Defendant published the Article as the most prominent part of a coordinated disinformation campaign carried out against the Claimant and his family members and business associates, escalating from August 2024 onwards ("**the Campaign**"). The Campaign has caused the Claimant very significant damage (including financial damage) and the fact that the Article

plays a part in it has greatly exacerbated his resulting distress. The Claimant will rely on the following facts and matters:

13.3.1. The Campaign initially took place from around August 2024, in the form of publications on Russian language websites and social media platforms, before increasing in scale and intensity in late 2024.

13.3.2. In December 2024 and January 2025, the Campaign was redirected, and its malign effects on the Claimant and his reputation were intensified by it being carried out via publications made in English. The Article was published and re-published between 16 – 18 January 2025.

13.3.3. The Article is the most high-profile, and ostensibly credible, iteration of the Campaign.

13.3.4. The Article includes allegations which are commonly, and exclusively, found in other articles published as part of the Campaign against the Claimant, such as falsely associating him with Gulnara Karimova.

13.3.5. The Article is written in the style of a legitimate and objective news or current affairs story and refers throughout to the Defendant in the third person, in a manner which suggests she is an independent expert in its subject matter being quoted by its journalist author. However, the impression of legitimacy and credibility which this gives the reader is false:

(a) the Article appears on the Defendant's Websites, on which all of the content appears to have been written or caused to be written by the Defendant personally, and therefore the references to her within it in the third person and as an independent expert are deliberately misleading;

10

(b) the Article is gratuitously sensationalist, referring in urgent terms to high-profile U.S. officials, despite the lack of any proper connection between those individuals and its ostensible subject matter;

(c) the Hyperlinked Article, cited as a source within the Article, was published on a now disabled website which was not on any view a reputable source of information or news, and amounted to a flagrant character assassination of the Claimant, and not, as it is repeatedly presented by the Defendant, a trustworthy source of news or information;

(d) paragraph 2.3 above is repeated. Although the exact nature of the services offered by the Defendant is unclear, her activities appear to take the form of paid advocacy and public relations work on behalf of clients, which includes publishing and promoting content on the Defendant's Websites and elsewhere;

(e) the content of the Article indicates that it has been written on behalf of and/or to advance the interests of Ulugbek Shadmanov, an adversary of the Claimant in respect of his business interests in Uzbekistan, who is referred to repeatedly within it. The Defendant is accordingly likely to have written and published it on behalf of Mr Shadmanov, or a person acting on his behalf, as her client; and

(f) the manner of the publication and republication of the Article on a series of different websites operated by the Defendant is inconsistent with the journalistic practice of only publishing a single, definitive, article in respect of a given story, and is more consistent with a paid public relations and/or disinformation campaign.

13.3.6. In the circumstances, the Article was published as part of the Campaign, and not as an exercise in legitimate and responsible journalism or disinterested policy activism.

11

13.4. The Defendant failed to comply with the Pre-Action Protocol for Media and Communications Claims ("**the Protocol**"). Instead, she adopted an inquisitorial and combative approach towards the Claimant and his complaint by:

13.4.1. Failing to provide a Protocol-compliant response to the Letter of Claim, setting out the nature of any defences relied upon, or exchanging other relevant information. The Defendant has never suggested that she has any, or any proper, basis for the allegations in the Article.

13.4.2. Instead, in a letter sent by her purported legal representative, Aleksejs Jelisejevs, dated 19 February 2025, asking a number of irrelevant, hostile, and self-serving questions of the Claimant. The questions clearly implied the truth of the imputations in the Article, while failing positively to assert that they are true, or to provide any other information about the circumstances of its publication.

13.4.3. Initially removing Publication 4 on a temporary basis, then reuploading it without good reason, before again removing it but keeping a draft of the published version. There is no good reason for the Defendant to keep a draft version (and alert the Claimant to that fact, which she did on 7 May 2025) if she had no intention to republish it at a future date, and if she was not in fact seeking - by referring to its draft status - to pressurise and threaten the Claimant in respect of his complaint.

13.5. The Defendant did not approach the Claimant for comment prior to publication of the Publications, nor did she amend those Publications which remain live upon receiving the denials in the letter of claim.

13.6. The Defendant has failed to apologise or correct the Article.

13.7. Publications 2 and 4 were taken down on a date unknown to the Claimant. However, at no point in pre-action correspondence did the Defendant disclose that the Article was also published on her other platforms, which have since been discovered by the Claimant.

**(b) Injunction**

14. In support of the Claimant's claim for an injunction, he relies upon the facts and matters pleaded at paragraphs 13.4.3, 13.5, 13.6, and 13.7 above.

**(c) Order under s.12 Defamation Act 2013**

15. The Claimant seeks an order under s.12 of the Defamation Act 2013 for the Defendant to prominently publish a summary of the judgment on each of her Websites and her Twitter/X page.

**AND the Claimant claims**

(1) Damages, including aggravated damages;
(2) An injunction to restrain the Defendant, whether by herself, her servants, agents, or otherwise howsoever from publishing and/or causing to be published the same or similar words defamatory of the Claimant;
(3) An Order that the Defendant publish a summary of the court's judgment under s.12 Defamation Act 2013;
(4) Costs; and
(5) Such further or other relief as the Court deems appropriate.

**GERVASE DE WILDE**
**LILY WALKER-PARR**
**5RB**
**6 June 2025**

**STATEMENT OF TRUTH**

I believe that the facts stated in these Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Name

Ovik Mkrtchyan

Date

06/06/2025

Signature